**NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al., Plaintiffs,**

**v.**

**Edward LEVI et al., Defendants.**

**Civ. A. No. 75–1317.**

United States District Court, District of Columbia.

Sept. 3, 1976.

Nathaniel R. Jones, George E. Hairston, James I. Meyerson, New York City, J. Francis Pohlhaus, Washington, D. C., George Howard, Jr., Pine Bluff, Ark., for plaintiffs.

Earl J. Silbert, U. S. Atty., J. Stanley Pottinger, Asst. Atty. Gen., William L. Gardner, Stephen Horn, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

PARKER, District Judge:

This proceeding presents troublesome questions of standing and prosecutorial discretion. They arise in connection with a citizen's death from gunshot wounds while in custody of Arkansas law enforcement officers. The plaintiffs allege that Federal officials failed to conduct an affirmative and exhaustive investigation of the incident and that they acted arbitrarily, capriciously and in a racially discriminatory manner to determine if the citizen's constitutionally guaranteed and other rights provided by Federal law had been violated.

At this point the defendants present two challenges to the litigation: a motion for change of venue and a motion to dismiss. For the reasons detailed below, the Court concludes that these initial challenges should be denied and that this proceeding should advance to trial.

The plaintiffs are the National Association for the Advancement of Colored People (NAACP), Mrs. Clementine Russ, widow of Carnell Russ and the Russ minor children.[1] The defendants are Edward Levi, the Attorney General of the United States, Clarence Kelley, the Director of the Federal Bureau of Investigation (FBI or Bureau) and certain FBI agents assigned to the Little Rock, Arkansas, office.

Jurisdiction is asserted under 28 U.S.C. § 1343(4) together with the Fifth, Thirteenth and Fourteenth Amendments and the Civil Rights Acts (42 U.S.C. §§ 1981 and 1985). Also, 28 U.S.C. § 1361 in conjunction

---

1. Mrs. Russ brings suit as mother and next friend of her minor children.

with 18 U.S.C. § 242, 28 U.S.C. § 509 and the Civil Rights Acts (42 U.S.C. § 1981) are invoked as grounds for jurisdiction.

In an amended complaint seeking declaratory, injunctive and other equitable relief, plaintiffs assert violations of the constitutional and civil rights of Carnell Russ, deceased, a citizen of Arkansas. They seek this Court's aid compelling the defendants to undertake a thorough and meaningful investigation into his fatal shooting. The shooting took place at the Lincoln County Courthouse, Star City, Arkansas, while Russ was in the custody of Arkansas law enforcement officers.

A motion to transfer the proceedings to the Eastern District of Arkansas has been filed by the defendants. They also move to dismiss the complaint and assert: that the plaintiffs lack standing to bring this suit; that they have failed to state a claim upon which relief can be granted; that the Court lacks jurisdiction over the subject matter of the complaint; and, that the doctrine of sovereign immunity shields the defendants from this litigation.

## FACTUAL BACKGROUND [2]

On May 31, 1971, Carnell Russ, a 24 year old black, while operating his motor vehicle on an Arkansas highway, was arrested for an alleged speeding violation by Jerry Mac Green, a white state trooper. Russ was accompanied by his wife, their minor children and an adult cousin. The trooper directed him to the County Courthouse. Russ complied and upon arrival, parked his vehicle and was escorted into the Courthouse by the arresting trooper and two other white law enforcement officers, Charles Ratliff and Norman Draper.[3] Minutes later, Russ returned to the vehicle where his family awaited. He requested and received from his wife sufficient money to post the necessary collateral. He then joined the three officers who were close by observing his

actions. The four retraced their steps with Russ again in custody.

A short time thereafter, Mrs. Russ first observed two of the officers leave and minutes later an ambulance depart from the rear of the Courthouse area where her husband had just entered in the officers' custody. She later learned that Mr. Russ, while under detention, had been shot in the center of his forehead by Ratliff and then transported to a hospital. Green and Draper were the sole witnesses to the shooting. Her husband died from the gunshot wound within hours.

The Governor of Arkansas ordered an immediate investigation of the incident by the State Police. In less than one week Ratliff was indicted for voluntary manslaughter. Plaintiffs allege that minutes or transcripts of the grand jury proceedings were not maintained. Ratliff was tried in January, 1972. The jurors' deliberations consumed less than 15 minutes and in that period they selected a foreperson, reviewed and considered the evidence and returned a verdict of "not guilty". Ratliff's weapon was not offered in evidence during his criminal trial. There was no evidence or testimony that Carnell Russ possessed or had access to a weapon while in custody. Indeed, the testimony was to the contrary.

The shooting triggered the attention of both the national and Arkansas branches of the NAACP. Immediately, those organizations embarked upon a campaign importuning the Justice Department to undertake an independent investigation to determine whether Federal laws had been violated in any manner. Several months following the acquittal of the state trooper, Assistant Attorney General David L. Norman of the Civil Rights Division of the Justice Department wrote to the General Counsel of the NAACP:

> After careful examination of the [Ratliff trial] transcript, as well as materials previously submitted by the Federal Bureau

---

2. The complaint, affidavits, exhibits and memoranda filed by the plaintiffs in this proceeding are the source of the factual statement. At this point they are undisputed.

3. Norman Draper was in a "trainee" status.

of Investigation, this Division has determined that this incident lacks prosecutive merit under federal criminal civil rights statutes. Therefore, we are closing our file.[4]

The plaintiffs allege that subsequent events and disclosures led them to believe that the Department's investigation was superficial, less than thorough and meaningless. The substance of their claim is that the FBI abdicated its responsibility and in effect applied a "whitewash" to the incident; that the Bureau deferred to and relied principally upon a report of the Criminal Investigation Division of the Arkansas State Police; and that the policy to rely solely on the state and local criminal justice system for vindication of a citizen's rights was unreasonable, improper, arbitrary and without a rational basis. Fairly read, the complaint alleges that the defendants acted in an arbitrary, capricious and discriminatory manner by failing to investigate the Russ shooting to determine if his constitutional rights and Federal statutes had been violated by Arkansas law enforcement authorities.

## THE VENUE MOTION

■ The defendants urge the transfer of this litigation to the Eastern District of Arkansas to accommodate the parties and witnesses and to serve the interests of justice. They contend that the majority of the parties are Arkansas residents; most of the witnesses likely to be called are resident of that State; that most of the significant and underlying events, the death, the grand jury investigation of the death, and the subsequent indictment and trial of the state troopers, all took place in Arkansas. Further, they point out that several related and companion civil cases stemming from Russ' death were filed, considered and tried in the Eastern District of Arkansas.[5]

In turn, the plaintiffs argue that the central issue in this litigation involves a denial and deprivation of constitutional and civil rights and the focus is on the official actions and decisions of a Federal government agency—the Department of Justice and specifically, the Office of the Attorney General and the Federal Bureau of Investigation. The administrators and officials responsible for the final agency action are headquartered in this jurisdiction. The data, reports and memoranda relating to the investigation conducted by the FBI and the Justice Department, if not located here, could certainly be made available with a minimum of delay and difficulty. The final decision of the Department of Justice closing the books on this matter was made in Washington, D. C.

While all of the data and evidence supporting the final decision were conceivably accumulated in Arkansas, a final review and determination was made by Federal officials stationed in this jurisdiction. *See: Starnes v. McGuire,* 168 U.S.App.D.C. 4, 512 F.2d 918 (1974). Nor is there any suggestion in defendants' memorandum that an agency representative or witness would be harassed, inconvenienced, disadvantaged or that any unusual and unnecessary problems would arise in the absence of a transfer. Indeed, it would appear that the Russ plaintiffs would be more adversely affected than the defendants.

■ The plaintiffs have made what is presumed to be a considered and deliberate choice of forums. Their choice is entitled to

---

4. Undated letter attached as an exhibit to the complaint. Plaintiffs refer to this letter as "dated March 1972."

5. The Russ plaintiffs filed a civil suit in the District Court for the Eastern District of Arkansas pursuant to 42 U.S.C. § 1983 and the Arkansas Wrongful Death Act, seeking damages from the three officers and various officials of Star City, Arkansas, for the death of Carnell Russ. The trial court directed a verdict dismissing the claims against all defendants except officers Green and Ratliff. The jury returned a finding in favor of the two officers. An appeal was then taken to the Eighth Circuit and in a recent unanimous opinion, that court reversed and remanded the case for a new trial against Ratliff and otherwise affirmed the judgment of the trial court. *Russ v. Ratliff,* 538 F.2d 799 (8th Cir., 1976).

serious consideration and should not be disturbed absent a strong showing that their chosen forum is completely inappropriate and inconvenient, a matter which this Court must resolve by an exercise of its discretion. *Norwood v. Kirkpatrick*, 349 U.S. 29, 31, 75 S.Ct. 544, 99 L.Ed. 789 (1955); *Hoffman v. Goberman*, 420 F.2d 423, 426–428 (3rd Cir. 1970). The defendants have not made such a showing. Their motion is denied.

## THE MOTION TO DISMISS

### The Question of Standing

■ For more than the last 50 years the NAACP has participated as party plaintiff, as intervenor and as *amicus curiae* in a variety and ever increasing amount of civil rights litigation. On behalf of its membership and black minorities it has achieved a reputation in both state and Federal courts as an organization with a special interest in the preservation and protection of their civil and constitutional rights. In 1963, Justice William J. Brennan recognized the standing of the NAACP to assert the rights of its members and remarked that the organization engages in litigation

> . . . [as] a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country.[6]

> \* \* \* \* \* \*

> . . . the litigation it assists, while serving to vindicate the legal rights of members of the American Negro community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society.[7]

That same observation is true today and as the plaintiffs have pointed out, the standing of this organization to sue and represent its members and nonmembers in the context of its objectives has never been denied in any reported judicial opinion.[8]

The NAACP's interest in the issues presented in this litigation is not abstract or general but rather it is real and direct. In their pleadings and affidavits the plaintiffs point to the past and continuing efforts of the organization to secure the civil rights of its memberships and others under Federal law against the arbitrary and discriminatory acts of government officials. Likewise, the Russ widow and children have a direct, significant and substantial interest. Accepting as true, as we must, the plaintiffs' allegations detailing the highly suspect circumstances of Mr. Russ' death, the government's investigation of the incident to determine if there had been a violation of Federal laws, was half-hearted at best. The family seeks a vindication of the deceased's rights and requests equitable relief against named Federal officials.

The plaintiffs have an interest in free access to and an even-handed application of the legal and criminal justice procedures of the Federal Government. They allege that they were injured because of the defendants' failure to undertake a sincere and meaningful investigation of Carnell Russ' death. This failure, they claim, was racially discriminatory and had the effect of denying to him, his family and to black Americans equal application of the laws in violation of their rights under the Constitution and the Civil Rights Acts. The Court concludes that the plaintiffs have shown that they satisfy the injury in fact element of the standing requirement.[9] The Constitutional and statutory enactments which the plaintiffs invoke are for the protection of persons against discriminatory treatment by government officials. Thus, the plaintiffs have shown that they are within the zone of interest protected by such enact-

6. *NAACP v. Button*, 371 U.S. 415 at 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963).

7. Id. at 431, 83 S.Ct. at 337.

8. Memorandum in Opposition to the Motion of the Defendants for a Change of Venue and to Dismiss the Action Herein, p. 49 filed December 29, 1975.

9. *Sierra Club v. Morton*, 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

ments.[10] Since the NAACP has long been committed to the civil rights struggle and because the Russ plaintiffs have an obvious desire to vindicate the rights of their deceased husband and father, the "logical nexus" between the plaintiffs' status and the government action from which they seek relief is also present.[11]

The government contends that plaintiffs lack standing since they have not shown that they have a sufficient "personal stake in the outcome of the controversy," *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); have not shown that injuries have been or will be sustained by them; and, because the "logical nexus" between any injury to the NAACP and the Russ family on the one hand and the government action complained of is insufficient or absent. In adopting this stance they rely principally on *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). There, the mother of an illegitimate child challenged as unconstitutionally discriminatory the application of a Texas criminal statute prohibiting the willful refusal of a parent to support his child on the ground that it was enforced by the state, as a result of state court interpretation of the statute, against married but not unmarried fathers. In holding that she lacked standing the majority court observed:

> . . . we hold that, in the unique context of a challenge to a criminal statute, appellant has failed to allege a sufficient nexus between her injury and the government action which she attacks to justify judicial intervention. To be sure, appellant no doubt suffered an injury stemming from the failure of her child's father to contribute support payments. But the bare existence of an abstract injury meets only the first half of the standing requirement. 'The party who invokes [judicial] power must be able to

show . . . that he has sustained or is immediately in danger of sustaining some *direct* injury *as the result of* [a statute's] enforcement,' (citations omitted). As this Court made plain in *Flast v. Cohen, supra,* a plaintiff must show 'a logical nexus between the status asserted and the claim sought to be adjudicated. . . . Such inquiries into the nexus between the status asserted by the litigant and the claim he presents are essential to assure that he is a proper and appropriate party to invoke federal judicial power. . . .' 410 U.S. at 617, 618, 93 S.Ct. at 1149.

The majority opinion of Justice Thurgood Marshall further stated ". . . that, in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id.* at 619, 93 S.Ct. at 1149.

This historic role of the NAACP in its efforts to secure for its members and others through litigation, the guaranteed civil rights which have been denied, cannot be ignored. Had Carnell Russ survived his encounter with the Arkansas law enforcement officers, there would be no question of his standing. Before this Court in his stead is the Russ family, seeking a vindication of his rights under law. The allegations of the complaint support the conclusion that they too have standing.

### Failure to State a Claim and Prosecutorial Discretion

■■ A prosecutor's chief responsibility is to see that the laws are faithfully executed and enforced in order to maintain the rule of law. He has an affirmative responsibility to investigate prudently suspected illegal activity when it is not adequately pursued by other agencies.[12] In *Linda, supra,* the question of standing focused on whether or not the plaintiff was an appro-

---

**10.** *Ass'n of Data Processing Service Organizations v. Camp.,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

**11.** *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

**12.** *See* generally: A.B.A. Standards Relating to the Administration of Criminal Justice, The Prosecution Function, Part III, (1974).

priate person to request judicial intervention—and more specifically, whether the victim of criminal acts may sue to correct allegedly unlawful prosecutorial conduct. Federal courts have traditionally acquiesced in discretionary decisions of the United States Attorney not to prosecute persons against whom a complaint of criminal conduct is made. The rule in this circuit is not otherwise. *United States v. Gainey,* 142 U.S.App.D.C. 262, 440 F.2d 290 (1971); *Newman v. United States,* 127 U.S.App.D.C. 263, 382 F.2d 479 (1967); *Powell v. Katzenbach,* 123 U.S.App.D.C. 250, 359 F.2d 234 (1965); *Moses v. Katzenbach,* 119 U.S.App.D.C. 352, 342 F.2d 931 (1965); *Moses v. Kennedy,* 219 F.Supp. 762 (D.D.C.1963). Even though judicial restraint is generally observed, an unfettered discretion is questionable when it fails to promote the ends of justice and denies rights conferred upon a citizen by the Constitution and by Federal law.

In *Nader v. Saxbe* [13] our Court of Appeals was concerned with an application for a mandatory injunction against the Attorney General and others to exercise their discretion to initiate prosecutions against violators of the Federal Corrupt Practices Act.[14] The plaintiffs were an individual citizen and a nonprofit corporation. The Act was enacted in 1925. While many violations had been committed, only one prosecution, a test case, had been brought. The Attorney General had exercised his prosecutorial discretion of nonenforcement.

The case was mooted by the repeal of the statute during the course of the litigation. However, Circuit Judge J. Skelly Wright suggested that prosecutorial discretion was not totally free from judicial review

> The instant complaint does not ask the court to assume the essentially Executive function of deciding whether a particular alleged violator should be prosecuted. Rather, the complaint seeks a conventionally judicial determination of whether

certain fixed policies allegedly followed by the Justice Department and the United States Attorney's office lie outside the constitutional and statutory limits of 'prosecutorial discretion.' 497 F.2d at 679.

In a continuing footnote he further commented

> The Executive's constitutional duty to 'take Care that the Laws be faithfully executed,' Art. II, § 3, applies to all laws, not merely to criminal statutes, *see In re Neagle,* 135 U.S. 1, 63–64, 10 S.Ct. 658, 34 L.Ed. 55 (1890). It would seem to follow that the exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review (citations omitted). The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that authority (citations omitted). Judicial review of the latter sort is normally available unless Congress has expressly withdrawn it (citations omitted) 497 F.2d at 679, 680, fn. 19.

▇ The judiciary has the responsibility of assuring that the purpose and intent of congressional enactments are not negated and frustrated by arbitrary conduct of government officials.[15] In *Medical Committee for Human Rights v. S. E. C.,* 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), Circuit Judge Edward A. Tamm noted

> [T]he decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness. 432 F.2d at 673.

The amended complaint, together with supporting affidavits and memoranda show: that named defendants undertook a token investigation to determine if a citizen's rights had been violated by Arkansas law enforcement personnel; that the Depart-

---

**13.** 162 U.S.App.D.C. 89, 497 F.2d 676 (1974).

**14.** 43 Stat. 1070, et seq., 2 U.S.C. former §§ 241–256.

**15.** *See: DeVito v. Schultz,* 300 F.Supp. 381 (D.D.C.1969).

ment of Justice adhered to a general policy when there were alleged violations of an individual's constitutional and civil rights by state officials, namely deferring to state criminal investigation rather than its own affirmative and objective investigation; that this policy was followed by the Attorney General in the Russ investigation; that the Federal Bureau of Investigation at the time was less than vigorous and diligent in investigating charges of unlawful conduct of state law enforcement officers against black individuals. This, the plaintiffs claim, was arbitrary and racially discriminatory conduct by Federal officials. They should be afforded an opportunity to support these allegations.

Lack of Subject Matter Jurisdiction and Sovereign Immunity

 The amended complaint invokes jurisdiction primarily under 28 U.S.C. § 1343(4) and § 1361 in conjunction with the Fifth, Thirteenth and Fourteenth Amendments, the Civil Rights Acts (42 U.S.C. §§ 1981 and 1985), and 18 U.S.C. § 242. Section 1343(4) confers jurisdiction in a district court to grant equitable or other relief under any Act of Congress providing for the protection of civil rights. Section 1361 authorizes mandamus actions.

 The defendants question the applicability of § 1981 and suggest that it does not generally support a cause of action charging discrimination by Federal officials or the Federal government. There is, however, persuasive authority to the contrary which this Court recognizes. *Penn v. Schlesinger,* 400 F.2d 700 (5th Cir. 1973); *Baker v. F & F Investment Co.,* 489 F.2d 829 (7th Cir. 1973). Further, Congress has explicitly given district courts power to consider cases in the nature of mandamus against Federal officials. When it is claimed that Federal officials are acting contrary to law, abusing their discretion and acting outside the limits of their permissible discretion, and when official conduct extends beyond any rational exercise of discretion, even though it is within the

letter of the authority granted, mandamus affords the appropriate judicial relief.

 Nor does the defense of sovereign immunity, as defendants urge, serve as an absolute jurisdictional bar to the maintenance of this action against the named defendants. *See: Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Economou v. Department of Agriculture,* 535 F.2d 688 (1976). If they have engaged in racially discriminatory practices proscribed by §§ 1981 or 1985, the plaintiffs should not be stopped at the threshold. Where the manner in which public officials exercise their authority is challenged as contrary to constitutional and statutory mandates, the doctrine of sovereign immunity may not prevail. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 702, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). While the plaintiffs may be limited as to the extent of the relief afforded by the Court, a consideration of that aspect at this time is speculative and premature. There is no sound basis for this Court to deny subject matter jurisdiction and sovereign immunity may not be asserted to avoid a hearing on the merits.

In *Scheuer v. Rhodes,* Mr. Chief Justice Burger, in delivering the opinion for the court remarked

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader. 416 U.S. 232 at 236, 94 S.Ct. at 1686 (1974).

On the basis of the foregoing it is this 3rd day of September, 1976

ORDERED that the motions of the defendants for a change of venue and to dismiss the complaint are denied, and it is

FURTHER ORDERED that the defendants shall respond forthwith to the plaintiffs' request for production of documents and submit answers to the plaintiffs first set of interrogatories by October 8, 1976.